No. 92,839

In the Matter of SCOTT C. STOCKWELL, *Respondent.*

(101 P.3d 1211)

Opinion filed December 17, 2004.

*Alexander M. Walczak,* deputy disciplinary administrator, argued the cause and was on the formal complaint for the petitioner.

*Greer S. Lang,* argued the cause for the respondent, and Scott C. Stockwell, respondent, appeared pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against Scott C. Stockwell, of Lawrence, Kansas, an attorney admitted to the practice of law in the state of Kansas.

The complaint filed against the respondent alleged that the respondent violated KRPC 1.1 (2003 Kan. Ct. R. Annot. 324) (competence); KRPC 1.3 (2003 Kan. Ct. R. Annot. 336) (diligence); KRPC 1.4 (2003 Kan. Ct. R. Annot. 349) (communication); KRPC 1.5 (2003 Kan. Ct. R. Annot. 362) (fees); KRPC 1.15(b) and (d)(1)(ii) (2003 Kan. Ct. R. Annot. 395) (safekeeping property); and KRPC 8.4(a) and (g) (2003 Kan. Ct. R. Annot. 464) (misconduct).

A disciplinary panel of the Kansas Board for the Discipline of Attorneys conducted a formal hearing as required by Kansas Supreme Court Rule 211 (2003 Kan. Ct. R. Annot. 264). The office of the Disciplinary Administrator appeared by and through Alexander M. Walczak, deputy disciplinary administrator. The respondent appeared pro se and filed no exceptions to the disciplinary panel's final hearing report.

The final hearing report of the panel makes the following findings of fact, conclusions of law, and recommendations to this court:

### "FINDINGS OF FACT

"Scott C. Stockwell (hereinafter "the Respondent") is an attorney at law. . . . His last registration address with the Clerk of the Appellate Courts of Kansas is . . . Lawrence, Kansas. . . . The Respondent was admitted to the practice of law in the state of Kansas on September 28, 1984.

"2. On April 21, 1994, Dolly McCauley executed a revocable trust agreement. The trust was titled the '1994 Dolly Madison Auld McCauley Living Trust' (hereinafter "Trust"). Originally, Mrs. McCauley and Mark Williams were co-trustees of the Trust. Thereafter, on June 24, 1994, Mrs. McCauley amended the Trust Agreement, and replaced Mr. Williams with attorney Donald L. Pitts.
[Here, a footnote from the hearing panel stated:] It appears that Mr. Pitts drafted the Trust Agreement for Mrs. McCauley.
"3. The Trust Agreement provides, in pertinent part, as follows:

'ARTICLE III
'Successor Beneficiaries

'Upon the death of the Grantor, the trust fund shall be distributed as follows:

'Section A. To each of grantor's then living grandchildren, five thousand dollars ($5,000.00) to be paid outright or held in trust pursuant to Article IV.

'Section B. One-third (⅓) of the remaining fund each to WILLIAM M. McCAULEY and ROBERT B. McCAULEY by representation, paid outright or held in trust pursuant to Article IV.

'Section C. The remaining balance of the fund to BETTY R. McCAULEY BUFORD, to be held in trust for her life. A monthly distribution shall be paid and distributions made only for life threatening medical expenses of the beneficiary or her living issue, as determined solely by the Trustee. Because of her special needs, any such monthly distributions to the beneficiary shall not be made by the Trustee if it will disqualify the beneficiary from residing in the place of residence she occupies at the time of my death. Upon her death, the then remaining trust fund shall be paid to her children, by representation, outright or held in trust pursuant to Article IV.

'Section D. In the event that any one of Grantors children predeceases the Grantor and leaves no issue, that share shall be distributed equally to Grantor's surviving children, by representation.

'Section E. If none of Grantor's children or their issue survive Grantor, the remaining trust funds shall be transferred, conveyed and paid over to Lawrence Memorial Hospital, Lawrence, Kansas, to be used where most needed with memorial recognition given to the Grantor.

'ARTICLE IV
'Distributions to Minors or Incompetents

'Shares shall be paid to the beneficiaries, outright and absolutely, except that if a beneficiary is a life in being at my death and under age *thirty-five* (35) years or determined to be incompetent as defined in this trust, then in that event, the share (or a portion thereof as hereafter specified), shall be turned over to my trustee hereafter named, and the trustee shall hold the designated amount as a separate fund vested in such minor or incompetent, but subject to the power in trust hereby given to the Trustees to administer and invest such fund and to use

the income or principal thereof for the benefit of such beneficiary as if such fund were held in trust hereunder. . . .

"4. Because Mr. Pitts accepted a position with the Kansas Attorney General's office, Mr. Pitts transferred his pending cases, looked for an attorney to serve as successor trustee, and closed his law practice. The Respondent agreed to take some of Mr. Pitts' cases.

"5. In October, 1997, Mr. Pitts introduced Mrs. McCauley to the Respondent. During that same meeting, the Respondent met with two of Mrs. McCauley's children, William M. McCauley and Betty R. McCauley Buford.

[Here, a footnote from the hearing panel stated:] Mrs. Buford suffers from a mental illness. Because of her disability, Mrs. Buford receives social security disability benefits. And, at the time of Mrs. McCauley's death, Mrs. Buford was residing in a sheltered living complex.

"6. On January 17, 1998, Mrs. McCauley died. At the time of Mrs. McCauley's death, all of her children were living and had exceeded the age of 35. In addition to her children, Mrs. McCauley was survived by six grandchildren: Johna Fox (age 33), William W. McCauley (age 31), Chad McCauley (age 29), Beau W. Buford (age 27), Travis McCauley (age 27), and Misty R. Noah (age 24).

"7. On January 18, 1998, the Respondent and Mr. Pitts met with Mrs. McCauley's three children at the funeral home regarding the Trust.

"8. On April 1, 1998, the Respondent replaced Mr. Pitts as the trustee of Mrs. McCauley's Trust. At the time that the Respondent became trustee, a number of tasks needed to be completed. First, the Respondent needed to apply to the Internal Revenue Service for a taxpayer identification number for the Trust. Second, according to the Trust Agreement, distributions needed to be made. Third, the Respondent needed to determine whether the Trust Agreement terms regarding Mrs. Buford qualified as a 'Special Needs Trust.' And, fourth, the Respondent needed to segregate the remaining proceeds to be paid to the grandchildren.

[Here, a footnote from the hearing panel stated:] Even though Mr. Pitts remained as trustee following Mrs. McCauley's death, until April 1, 1998, Mr. Pitts did not obtain a taxpayer identification number from the IRS for the Trust, distribute any Trust proceeds, determine whether the Trust Agreement terms regarding Mrs. Buford qualified as a 'Special Needs Trust,' nor did he segregate the remaining amounts to be paid to the grandchildren.

"9. After becoming trustee, the Respondent did not immediately apply to the Internal Revenue Service for a taxpayer identification number, distribute any proceeds of the Trust, determine whether the Trust Agreement terms regarding Mrs. Buford qualified as a 'Special Needs Trust,' nor did he segregate the grandchildren's portions of the Trust estate.

[Here, a footnote from the hearing panel stated:] It was not until March 26, 2000, that the Respondent applied to the IRS for a taxpayer identification number for the Trust.

"10. The Respondent failed to file the 1998 tax return for the Trust on or before April 15, 1999, as required by law.

"11. On December 13, 1999, William McCauley sent the Respondent an electronic mail message. In the message, Mr. McCauley requested that the Respondent provide an accounting of the Trust. The Respondent did not immediately respond to the electronic message. Moreover, the Respondent did not provide an accounting of the Trust to Mr. McCauley in response to the request.
[Here, a footnote from the hearing panel stated:] At the time the Respondent resigned as trustee of the Trust, the Respondent provided a final accounting of the Trust.

"12. The Respondent failed to file the 1999 tax return for the Trust on or before April 15, 2000, as required by law. (The Respondent filed the 1999 tax return for the Trust on June 22, 2000.)

"13. On April 25, 2000, the Respondent sold the real estate owned by the Trust. The buyer provided the Respondent with $5,000.00 in earnest money. The Respondent deposited the earnest money into his attorney trust account. After the sale was completed, the Respondent failed to transfer the earnest money to the Trust's account. Because the Respondent sold the real estate without the assistance of a real estate agent, the Trust did not pay a realtor's fee.

"14. The Respondent failed to file the 2000 tax return for the Trust on or before April 15, 2001, as required by law.

"15. William McCauley served as the primary liaison between the beneficiaries and the Respondent. From time to time, Mr. McCauley called the Respondent to obtain information regarding the Trust. Many times, however, the Respondent was not available when Mr. McCauley called. Furthermore, the Respondent failed to return nearly all of Mr. McCauley's telephone calls.

"16. In July, 2001, William McCauley scheduled a meeting with the Respondent for August 3, 2001. Additionally, the meeting was to be attended by Robert McCauley and Betty McCauley Buford. Apparently, when William McCauley scheduled the meeting with the Respondent, Mr. McCauley made it clear to the Respondent that a successor trustee needed to be appointed.

"17. Prior to the August 3, 2001, meeting, the Respondent had the tax returns for the Trust for tax years 1998 and 2000 prepared.

"18. Even though he had scheduled the meeting with the Respondent, and because the Respondent had failed to communicate with him and had not distributed the Trust estate pursuant to the Trust Agreement, William McCauley retained attorney Keenan Post. Mr. Post accompanied William McCauley to the August 3, 2001, meeting. The Respondent, however, was not aware that William McCauley had retained an attorney to represent him and that the attorney would be coming to the meeting.

"19. At the outset of the meeting, Mr. Post asked the Respondent why Mr. Post should not file a complaint with the Disciplinary Administrator's office regarding his handling of the Trust. During the meeting, the Respondent provided Mr. Post with the tax returns that the Respondent had prepared for 1998 and 2000. Also,

during the meeting, the Respondent agreed to resign as trustee when a successor trustee was appointed.

"20. On August 17, 2001, the Respondent met with Mr. Post and representatives of Capital City Bank. At that time, Capital City Bank was appointed as successor trustee for the Trust.

"21. Prior to the August 17, 2001, meeting, the Respondent paid himself $8,735.48 in legal fees by transferring the $5,000.00 in earnest money from his attorney trust account to his operating account on August 3, 2001, and by writing a check drawn on the Trust's account in the amount of $3,735.48, on August 17, 2001.

"22. The Respondent did not make any distributions to the beneficiaries during the time period he served as the trustee of the Trust.

"23. In January, 2002, Mr. Post, acting as the attorney for the successor Trustee, Capital City Bank, demanded that the Respondent return the attorney fees taken by the Respondent. Mr. Post and the Respondent negotiated a settlement of the return of the fee. The Respondent agreed to pay the Trust $12,026.91 in three installments. The Respondent provided the bank with three post-dated checks. The Respondent provided the bank with a check that was dated March 15, 2002, in the amount of $4,026.91, a check that was dated April 15, 2002, in the amount of $4,000.00 and a check that was dated May 15, 2002, in the amount of $4,000.00.

"24. The first two checks were paid when presented; however, the check that was dated May 15, 2002, was presented twice and returned twice because there were not sufficient funds in the account to pay the check. On June 4, 2002, Capital City Bank wrote to the Respondent and demanded payment pursuant to the worthless check statute. The Respondent did not respond to the letter.

"25. On July 19, 2002, Todd Butler, an attorney retained to collect the debt for Capital City Bank, wrote to the Respondent and demanded payment. The Respondent did not respond to the letter.

"26. On August 2, 2002, Mr. Post and Terri D. Thomas of Capital City Bank filed a written complaint with the Disciplinary Administrator's office.

"27. On August 7, 2002, Mr. Butler again wrote to the Respondent regarding the bad check. The Respondent failed to respond to the second letter from Mr. Butler.

"28. On September 5, 2002, the Respondent delivered a cashier's check to Mr. Butler.

"29. After Capital City Bank became the trustee of the Trust, on November 13, 2001, the bank distributed the $5,000.00 gifts to each grandchild. The bank, as trustee, reasoned that, if the gifts were retained and distributed according to the terms of the Trust Agreement, the gifts would be greatly diminished by bank charges. The bank decided that Mrs. McCauley would not have wanted her grandchildren's gifts to be diminished by the bank charges that would have necessarily have been incurred. Thereafter, in April 2002, the bank distributed interest payments to the grandchildren.

"30. The bank also established a new trust for the benefit of Mrs. Buford. On November 13, 2001, the bank made an initial distribution to William McCauley, Robert McCauley, and the Betty Buford Trust.

"31. On October 9, 2002, the bank made a final distribution to the Betty Buford Trust. On November 4, 2002, the bank made a final distribution to Robert McCauley. Finally, on November 22, 2002, the bank made a final distribution to William McCauley and closed the trust."

## "CONCLUSIONS OF LAW

"1. Based upon the findings of fact, the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 1.3 [diligence], KRPC 1.4 [communication], and KRPC 1.15(b) [fees], as detailed below.

[Here, a footnote from the hearing panel stated:] In addition to KRPC 1.3, KRPC 1.4, and KRPC 1.15(b), the Deputy Disciplinary Administrator also alleged that the Respondent violated KRPC 1.1, KRPC 1.5, KRPC 1.15(d)(1)(ii), KRPC 8.4(a), and KRPC 8.4(g). The Hearing Panel does not find clear and convincing evidence that the Respondent violated KRPC 1.1, KRPC 1.5, KRPC 1.15(d)(1)(ii), KRPC 8.4(a), and KRPC 8.4(g). The Hearing Panel does, however, wish to comment on the Respondent's billing practice. Throughout the period of time that the Respondent was the trustee, the Respondent billed the Trust for 'Account Maintenance.' At the hearing on this matter, the Respondent was unable to satisfactorily explain what he did to earn the fee charged as 'Account Maintenance.' The Respondent's failure to provide a satisfactory explanation does not rise to the level of clear and convincing evidence that the Respondent violated KRPC 1.5.

"2. Attorneys must act with reasonable diligence and promptness in representing their clients. *See* KRPC 1.3. In this case, the Respondent stipulated that he failed to provide diligent representation to the Trust. Specifically, the Hearing Panel concludes that the Respondent failed to (1) immediately obtain a taxpayer identification number, (2) make initial distributions according to the terms of the Trust Agreement, (3) timely file Trust tax returns, and (4) timely research whether the terms of the Trust Agreement regarding Mrs. Buford amounted to a 'Special Needs Trust.' Other than receiving and retaining reports on the Trust's assets and communicating from time to time with William McCauley, the only thing that the Respondent accomplished for the Trust during the three and one-half years he was trustee was the sale of the real estate. Because the Respondent failed to act with reasonable diligence and promptness, the Hearing Panel concludes that the Respondent violated KRPC 1.3.

"3. KRPC 1.4(a) provides that "[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." In this case, the Respondent violated KRPC 1.4(a) when he failed to keep William McCauley reasonably informed regarding the administration of the Trust. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 1.4(a).

[Here, a footnote from the hearing panel stated:] The Formal Complaint alleges that the Respondent violated KRPC 1.4(b). However, the facts alleged in the Formal Complaint (see ¶ 7 of the Formal Complaint) and the facts established at the hearing on this matter support a conclusion that the Respondent violated KRPC 1.4(a).

"4. Attorneys must safeguard their clients' property. Specifically, KRPC 1.15(b) provides:

'Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.' "

The Respondent stipulated that he violated KRPC 1.15(b). Specifically, the Respondent failed to promptly deposit the $5,000.00 into the Trust's account. The Respondent retained the earnest money in his attorney trust account for approximately sixteen months. Had the Respondent deposited the earnest money in the Trust's account, the Trust could have earned interest. However, because the Respondent failed to transfer the money to the Trust's account, the Trust did not earn any interest on the $5,000.00. The Hearing Panel concludes that the Respondent violated KRPC 1.15(b) by failing to transfer the earnest money to the Trust's account.

## "RECOMMENDATION

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated his duty to his client to provide diligent representation and adequate communication. Additionally, the Respondent violated his duty to his client to safeguard his client's property.

"*Mental State.* The Respondent negligently violated his duty.

"*Injury.* As a result of the Respondent's misconduct, the Respondent caused injury to the Trust by failing to transfer the $5,000.00 in earnest money to the Trust's interest bearing account. Had the Respondent transferred the earnest money to the Trust's interest bearing account, the Trust would have received

interest on the $5,000.00 for sixteen months. Additionally, the Respondent's failure to distribute the trust assets to the beneficiaries caused potential injury. Had the Respondent distributed the trust assets according to the terms of the beneficiaries, the beneficiaries would have had access to their property much sooner. As a result, the beneficiaries lost their ability to use the property for a period of time.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"Prior Disciplinary Offenses. On August 8, 2001, in DA7736, the Disciplinary Administrator's office informally admonished the Respondent for having violated KRPC 1.3 and KRPC 1.4.

"Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted the Respondent to practice law in 1984. At the time the Respondent engaged in misconduct, the Respondent had been practicing law for a period of 14 years. Accordingly, the Hearing Panel concludes that the Respondent had substantial experience in the practice of law at the time he engaged in the misconduct.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"Absence of a Dishonest or Selfish Motive. Dishonesty and selfishness were not motivating factors in this case.

"Timely Good Faith Effort to Make Restitution or to Rectify Consequences of Misconduct. The Respondent has returned the fees that he received during his tenure as Trustee. (Although the third check was returned for insufficient funds, eventually the Respondent provided a cashier's check for the final $4,000.00.)

"The Present and Past Attitude of the Attorney as Shown by the Respondent's Cooperation During the Hearing and the Respondent's Acknowledgment of the Transgressions. The Respondent fully cooperated in the disciplinary process as exhibited by his complete acknowledgment of the misconduct.

"Previous Good Character and Reputation in the Community Including any Letters from Clients, Friends, and Lawyers in Support of the Character and General Reputation of the Attorney. The Respondent is an active and productive member of the bar in Lawrence, Kansas. He enjoys the respect of his peers and clients and generally possesses a good character and reputation as evidenced by several letters received by the Hearing Panel.

"Remorse. At the hearing on the Formal Complaint, the Respondent expressed genuine remorse.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'Reprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client. Standard 4.13.'

'Reprimand is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes injury or potential injury to a client. Standard 4.43.'

"Based upon the findings of fact, conclusions of law, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be censured by the Kansas Supreme Court. The Hearing Panel further recommends that the censure be published in the Kansas Reports.

"Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

The Respondent files no exceptions to the panel's final hearing report.

The court, having considered the record, the final hearing report of the panel, and arguments before this court, agrees with and adopts the findings, conclusions, and recommendations of the hearing panel.

The court further finds that the violations set forth below are supported by clear and convincing evidence and that the evidence supports the panel's conclusions of law.

IT IS THEREFORE ORDERED THAT Scott C. Stockwell be censured in accordance with Supreme Court Rule 203(a)(3) (2003 Kan. Ct. R. Annot. 226) for violations of KRPC 1.3, KRPC 1.4, and KRPC 1.15(b).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this order be published in the official Kansas Reports.